# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

MARJORIE TOWNLEY,

    **Plaintiff,**

v.

THE SERVICEMASTER COMPANY, LLC and TERMINIX D/B/A SCHENDEL PEST SERVICES,

    **Defendants.**

Case No. 17-2430-DDC-JPO

## MEMORANDUM AND ORDER

This matter comes before the court on plaintiff's Motions for Default Judgment against defendants The Servicemaster Company, LLC ("Servicemaster") and Terminix d/b/a Schendel Pest Services. Docs. 12 & 13. The court held a hearing on these motions on October 17, 2017. Plaintiff testified at the hearing and presented other evidence. Plaintiff asked the court to enter default judgment against defendants on her Title VII claims for sex discrimination and retaliation. Plaintiff also made a damage request at the hearing, asking the court to award her damages for lost wages, front pay, emotional distress, and punitive damages.

After carefully considering the evidence adduced at the October 17, 2017 hearing and plaintiff's submissions, the court grants plaintiff's Motions for Default Judgment against both defendants and awards $29,261.68 for back pay damages, $86,400 for front pay damages, $50,000 for emotional distress damages, and $100,000 for punitive damages. The court explains how it reaches this decision below.

    **I.    Procedural Background**

Plaintiff Marjorie Townley, a former employee of defendants, filed this employment

discrimination action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.*, alleging sex discrimination and retaliation.  Doc. 1.  Her Complaint alleges that defendants employed her as a District Sales Manager in the Lenexa, Kansas office from about April 3, 2016, until her termination in mid-February 2017.  The Complaint also alleges that plaintiff experienced sex discrimination and harassment throughout her employment, she complained about sex discrimination and harassment to defendants about 20 to 30 times during her employment, defendants never addressed plaintiff's complaints, and defendants terminated plaintiff's employment to retaliate against her for complaining about sex discrimination and harassment.  Plaintiff's Complaint seeks compensatory and punitive damages, costs and attorney's fees, and such other relief as the court deems just and proper.

Plaintiff served defendant Terminix d/b/a Schendel Pest Services at its business address in Lenexa, Kansas, on August 1, 2017, as noted on the return of service filed with the court.  Doc. 3.  Plaintiff served defendant Servicemaster by serving its registered agent in Knoxville, Tennessee, on August 2, 2017, as noted on the return of service filed with the court.  Doc. 4.

On September 14, 2017, plaintiff filed Applications for Clerk's Entry of Default against defendants (Docs. 8 & 9) because neither defendant had filed an Answer after plaintiff served them with the summons and Complaint.  The Clerk of the Court entered default against both defendants on September 15, 2017 (Docs. 10 & 11).  To date, neither defendant has answered this lawsuit.  Both defendants, thus, are in default.

Also, neither defendant has appeared personally or by a representative at any time in this case.  Thus, written notice of the application for default to defendants is not required.  *See* Fed. R. Civ. P. 55(b)(2) (requiring seven days' notice of the application for default judgment only when "the party against whom a default judgment is sought has appeared personally or by

representative"); *see also Winfield Assocs., Inc. v. Stonecipher*, 429 F.2d 1087, 1091 (10th Cir. 1970) (denying relief from a default judgment entered by a district court in Illinois without notice to defendant because the Illinois court concluded that defendant had not entered an appearance in the case); *Local Union No. 226 Int'l Bhd. of Elec. Workers Open End Pension Tr. Fund v. Flowers Elec., Inc.*, No. Civ. A. 04-2237-CM, 2004 WL 2278562, at *1 (D. Kan. July 23, 2004) (holding that defendant's acceptance of service was not an appearance for purposes of Rule 55(b)(2), and thus concluding that no written notice of the motion for default judgment was required because defendant had not appeared in the action).

## II. Legal Standard

Federal Rule of Civil Procedure 55 provides a two-step process for securing a default judgment. First, Rule 55(a) allows the Clerk to enter default against a party who "has failed to plead or otherwise defend" a lawsuit. Second, after the Clerk enters default, plaintiff may request the Clerk to enter judgment in an amount that is "a sum certain or a sum that can be made certain by computation." Fed. R. Civ. P. 55(b)(1). But, when a plaintiff's claim is not for a sum certain or a sum made certain by calculation, plaintiff must apply to the court for a default judgment under Rule 55(b)(2). When considering a motion for default judgment, the court may hold a hearing if "it needs to (A) conduct an accounting; (B) determine the amount of damages; (C) establish the truth of any allegation by evidence; or (D) investigate any other matter." Fed. R. Civ. P. 55(b)(2).

"Once the default is established, defendant has no further standing to contest the factual allegations of plaintiff's claim for relief." *Mathiason v. Aquinas Home Health Care, Inc.*, 187 F. Supp. 3d 1269, 1274 (D. Kan. 2016) (citations and internal quotation marks omitted). The court

3

accepts as true the well-pleaded factual allegations from plaintiff's Complaint but not allegations about the amount of damages. *Id.*

But, even after default, "'it remains for the court to consider whether the unchallenged facts constitute a legitimate cause of action, since a party in default does not admit mere conclusions of law.'" *Bixler v. Foster*, 596 F.3d 751, 762 (10th Cir. 2010) (quoting 10A Charles A. Wright et al., *Federal Practice and Procedure* § 2688, at 63 (3d ed. 1998)). The district court exercises broad discretion when deciding whether to enter a default judgment. *Mathiason*, 187 F. Supp. 3d at 1274.

A default judgment also does not establish the amount of damages. *Id.* at 1274–75. Instead, "[p]laintiff must establish that the amount requested is reasonable under the circumstances." *Id.* at 1275 (citing *DeMarsh v. Tornado Innovations, LP*, No. 08-2588-JWL, 2009 WL 3720180, at *2 (D. Kan. Nov. 4, 2009)). A court may award damages "'only if the record adequately reflects the basis for [the] award via a hearing or a demonstration by detailed affidavits establishing the necessary facts.'" *DeMarsh*, 2009 WL 3720180, at *2 (quoting *Adolph Coors Co. v. Movement Against Racism & the Klan*, 777 F.2d 1538, 1544 (11th Cir. 1985) (further citations and internal quotation marks omitted)).

**III. Findings of Fact**

The court finds that plaintiff is entitled to damages under Title VII, based on these facts, taken from plaintiff's Complaint and attached exhibits, as well as testimony and evidence presented at the October 17 hearing. Plaintiff testified at this hearing. Neither defendant appeared personally or by its representative at the hearing. Defendants thus presented no witnesses or evidence on their behalf. They also did not cross-examine plaintiff. The court

found plaintiff's testimony credible and incorporates her testimony into the factual findings below.

### A. Facts Establishing Violations of Title VII

Defendants employed plaintiff at an office located in Lenexa, Kansas, from April 4, 2016, to mid-February 2017. Plaintiff asserts that both defendants employed her. Plaintiff understands that Servicemaster owns defendant Terminix d/b/a Schendel Pest Services. Plaintiff testified that Servicemaster provided the employee handbook and Human Resources services during her employment. Servicemaster also issued plaintiff's paycheck. But, Terminix employed plaintiff's boss's bosses, and Terminix hosted all of the regional meetings that plaintiff attended. Also, plaintiff held a position with Schendel Pest Services, and she had business cards with that company name on them. Both Servicemaster and Terminix employ more than 500 employees.

Plaintiff was the only female employed in the Lenexa office where she worked. During her employment, plaintiff experienced discriminatory and harassing comments based on her sex. Male coworkers told plaintiff that she was hired only for affirmative action, that she worked in a man's world, and that she was successful during walk-in visits with customers because she had certain assets that men don't have. On one occasion, plaintiff walked into a room for a meeting, and one of the male employees said, "Look, dessert just walked in." He then asked the other men in the room, "Do you want to use a spoon or a fork?"

Plaintiff also experienced different treatment than her male counterparts received. Plaintiff had a company car that was an older model and had more miles on it than any of the newer company vehicles her male coworkers received. Plaintiff also received less training and less profitable sales leads than those provided to the male employees.

Plaintiff complained about 20 to 30 times about discrimination and harassment, but defendants never responded to her complaints. Plaintiff submitted three written complaints to Human Resources, and she made two Hotline complaints. Defendants ignored all of these complaints. Plaintiff's bosses laughed at her complaints and told her to lighten up. Plaintiff also complained to the Vice President of Human Resources with Servicemaster. But, the Vice President sent the complaint back to a regional person, who reported she found no evidence to support plaintiff's complaints. So, no action was taken.

When plaintiff made her last complaint of discrimination, defendants directed her to a "We Listen" process that defendants should have implemented months earlier. Plaintiff asked that defendants speak with her attorney, which they did. Seven days later, defendants terminated plaintiff's employment. Defendants told plaintiff that her lack of sales produced her termination, but other male employees did not meet their sales quotas for the year and defendants did not fire those male employees. Plaintiff also tried to note on her termination paperwork that her discharge was retaliation for her complaints about sex discrimination and harassment. Defendants tried to coerce her to remove that information from the termination documents.

**B. Facts Establishing the Type and Amount of Plaintiff's Damages**

Plaintiff testified that her annual base salary during her employment with defendants was $40,000. Plaintiff also was eligible to receive commissions of 10% for every sale that she made. Once she met her sales quota, plaintiff then was eligible to receive an 18% commission for every sale that she made above her sales quota. Plaintiff estimated that her annual total salary, including commissions, was about $45,000 during her employment with defendants.

Defendants also provided plaintiff certain employee benefits, including health insurance, a matching 401K program, time off, sick leave, vacation time, a company car, and a company gas card. Plaintiff estimated the value of her lost benefits as $20,000.

Plaintiff testified that she has found other employment since defendants discharged her. She was hired on June 4, 2017, as an independent contractor with the Small Business Growth Alliance. Plaintiff sells credit card services, earning a commission on each sale. Plaintiff estimated that she has earned about $2,600 a month in this position. Multiplying that figure by the 4.5 months that plaintiff has worked in her new employment, plaintiff has earned about $11,700 in wages.

Plaintiff also has worked in the evenings as an instructor at a college. But, plaintiff held that employment while she worked for defendants. So, her earnings in this position are not mitigation wages. Plaintiff also testified that she had no plans to leave defendants' employment before her termination. Since her discharge in mid-February, plaintiff has searched for new employment. Plaintiff has applied for over 1,000 jobs. At first, plaintiff applied for sales positions but later she expanded her job search to include other industries when she was unable to find employment. Plaintiff also has expanded her job search to cities across the United States. Plaintiff believes that she has experienced difficulty finding another full-time job because she answers questions honestly in her job interviews, *i.e.*, she informs potential employers that she is no longer working for defendants because they terminated her.

Plaintiff also testified that she has sustained emotional distress from defendants' discrimination and termination of her employment. She has endured stress from not having sufficient funds to pay her bills or afford her housing. She also experiences stress from bill collectors calling her. And, plaintiff has had days when she cries and feels depressed.

## IV. Conclusions of Law

### A. Subject Matter Jurisdiction

"Before it may enter default judgment, the Court has an affirmative duty to determine whether it has subject matter jurisdiction." *Olivas v. Bentwood Place Apartments, LLC*, No. 09-4035-JAR, 2010 WL 2952393, at *6 (D. Kan. July 26, 2010) (citing *Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982)). Federal courts have original jurisdiction "of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. Here, plaintiff asserts a claim for civil rights violations under Title VII. Plaintiff's lawsuit thus arises under federal law, and the court has subject matter jurisdiction under 28 U.S.C. § 1331.

Historically, the Tenth Circuit has treated a failure to exhaust administrative remedies as a jurisdictional bar to filing suit in federal court. *Jones v. UPS, Inc.*, 502 F.3d 1176, 1183 (10th Cir. 2007) (first citing *MacKenzie v. City & Cty. of Denver*, 414 F.3d 1266, 1274 (10th Cir. 2005); then citing *Shikles v. Sprint/United Mgmt. Co.*, 426 F.3d 1304, 1317 (10th Cir. 2005)). More recently, however, the Tenth Circuit has suggested that certain exhaustion requirements are not jurisdictional but merely constitute conditions precedent to filing a lawsuit. *Jones v. Needham*, 856 F.3d 1284, 1289 (10th Cir. 2017); *Gad v. Kan. State Univ.*, 787 F.3d 1032, 1038 (10th Cir. 2015).

Whether viewed as a jurisdictional prerequisite or a condition precedent, plaintiff here has satisfied her obligation to exhaust administrative remedies before bringing her Title VII suit. On September 26, 2016, plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), Kansas Human Rights Commission ("KHRC"), and Missouri Commission on Human Rights ("MCHR"), alleging sex discrimination and retaliation.

Doc. 1-1. On February 8, 2017, plaintiff filed an Amended Charge of Discrimination with the EEOC and MCHR (Doc. 1-2), and on February 27, 2017, plaintiff filed a Second Amended Charge of Discrimination with the EEOC and MCHR (Doc. 1-3). On May 9, 2017, the EEOC issued a Notice of Right to Sue to plaintiff for her Charge of Discrimination. Doc. 1-4. And, on May 24, 2017, the MCHR issued a Notice of Right to Sue to plaintiff for her Charge of Discrimination. Doc. 1-5.

Based on the facts alleged in the Complaint, plaintiff timely filed her Charge of Discrimination within 300 days of her termination in mid-February 2017. 42 U.S.C. § 2000e-5(e)(1). Plaintiff also timely filed this lawsuit on July 28, 2017 (Doc. 1), within 90 days of the EEOC issuing its Notice of Right to Sue. *Id.* § 2000e-5(f)(1). Plaintiff thus has exhausted her administrative remedies before filing suit.

### B. Personal Jurisdiction

A court also must have personal jurisdiction over a defendant before entering a default judgment. *Bixler*, 596 F.3d at 761. In a federal question case, like this one, a court can assert personal jurisdiction over a defendant if: (1) the applicable statute potentially confers jurisdiction by authorizing service of process on the defendant; and (2) the exercise of jurisdiction comports with due process. *Klein v. Cornelius*, 786 F.3d 1310, 1317 (10th Cir. 2015) (quoting *Peay v. BellSouth Med. Assistance Plan*, 205 F.3d 1206, 1209 (10th Cir. 2000) (further citations omitted)).

Title VII does not confer nationwide service of process. *Daneshvar v. Graphic Tech., Inc.*, No. 04-2212-JWL, 2005 WL 348312, at *2 (D. Kan. Feb. 11, 2005). So, Fed. R. Civ. P. 4(k)(1)(A) governs service. *See Dudnikov v. Chalk & Vermillion Fine Arts, Inc.*, 514 F.3d 1063,

1070 (10th Cir. 2008) (citing Fed. R. Civ. P. 4(k)(1)(A)). This Rule requires the court to apply the law of the forum state where the district court is situated. Fed. R. Civ. P. 4(k)(1)(A).

Under the Kansas long-arm statute, a party submits to personal jurisdiction in Kansas for any claim for relief arising from transacting any business in this state or for committing any tortious act in this state. Kan. Stat. Ann. § 60-308(b)(1)(A) & (b)(1)(B). Kansas' long-arm statute is construed liberally to permit exercise of jurisdiction in every situation that is consistent with the United States Constitution. *Federated Rural Elec. Ins. Corp. v. Kootenai Elec. Coop.*, 17 F.3d 1302, 1305 (10th Cir. 1994) (citation omitted); *see also* Kan. Stat. Ann. § 60-308(b)(1)(L) & (b)(2). Thus, the court need not conduct a separate personal jurisdiction analysis under Kansas law, because the "first, statutory, inquiry effectively collapses into the second, constitutional, analysis." *Dudnikov*, 514 F.3d at 1070.

The court is satisfied that personal jurisdiction exists here over each defendant. Plaintiff's Complaint alleges that both defendants conduct business in Kansas. The Complaint also alleges that both defendants committed all or part of the discriminatory and retaliatory conduct in Kansas. Personal jurisdiction thus is proper because defendants have conducted business in Kansas and committed discriminatory employment practices in Kansas. *See*, *e.g.*, *Dodson Int'l Parts, Inc. v. Altendorf*, 181 F. Supp. 2d 1248, 1253–54 (D. Kan. 2001) (holding that personal jurisdiction existed when a non-resident defendant allegedly committed tortious acts in Kansas that injured a Kansas resident); *Brandi v. Belger Cartage Serv., Inc.*, 842 F. Supp. 1337, 1341 (D. Kan. 1994) (noting that "there must be some act by which the defendant purposefully avails himself or herself of the privilege of conducting business or other activities in the forum state, thus invoking the benefits and protections of the laws") (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)).

Plaintiff also served both defendants personally as Federal Rule of Civil Procedure 4 requires. Plaintiff served defendant Terminix d/b/a Schendel Pest Services at its business address in Lenexa, Kansas, on August 1, 2017, and plaintiff served defendant Servicemaster by serving its registered agent in Knoxville, Tennessee, on August 2, 2017. Service in this manner complies with the requirements of Rule 4(h)(1). The court thus concludes that service properly was made, and the court has personal jurisdiction over both defendants.

### C. Liability and Damages Under Title VII

The facts here establish a violation of Title VII for sex discrimination and retaliation. Title VII prohibits an employer from discriminating against an individual "with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). Title VII also prohibits an employer from discriminating against an employee who opposes any practice made unlawful by Title VII. *Id.* § 2000e-3(a). Based on the findings of fact above, plaintiff has established that defendants violated Title VII by discriminating against her based on sex in the terms and condition of her employment. Plaintiff also has established that defendants violated Title VII by terminating her employment as retaliation for complaining about unlawful sex discrimination.

The court also concludes that plaintiff has established sufficiently that both defendants employed her to hold them both liable for Title VII violations. The Tenth Circuit uses three different tests when determining whether a defendant is an "employer" under Title VII: (1) the hybrid test; (2) the joint employer test; and (3) the single employer test. *Knitter v. Corvias Military Living, LLC*, 758 F.3d 1214, 1225–26 (10th Cir. 2014). Here, plaintiff alleges that defendants fall under the second test because they are joint employers. Doc. 1 at 2. "Under the joint employer test, two entities are considered joint employers if they 'share or co-determine

those matters governing the essential terms and conditions of employment.'" *Knitter*, 758 F.3d at 1226 (quoting *Bristol v. Bd. of Cty. Comm'rs*, 312 F.3d 1213, 1218 (10th Cir. 2002)). And, to hold both entities liable as joint employers, they both must exercise significant control over the terms and conditions of a worker's employment. *Id.* (first citing *Bristol*, 312 F.3d at 1218; then citing *Sizova v. Nat'l Inst. of Standards & Tech.*, 282 F.3d 1320, 1330 (10th Cir. 2002)).

The most important aspect of control over the terms and conditions of employment "'is the right to terminate it under certain circumstances . . . .'" *Id.* (quoting *Bristol*, 312 F.3d at 1219). "Additional factors courts consider for determining control under the joint employer test include the ability to 'promulgate work rules and assignments, and set conditions of employment, including compensation, benefits, and hours; . . . day-to-day supervision of employees, including employee discipline; and . . . control of employee records, including payroll, insurance, taxes and the like.'" *Id.* (quoting *Butterbaugh v. Chertoff*, 479 F. Supp. 2d 485, 491 (W.D. Pa. 2007)).

Here, plaintiff's Complaint and her testimony present sufficient facts for the court to conclude that both defendants controlled the terms and conditions of plaintiff's employment. Their control renders both defendants liable under the "joint employer" test. Plaintiff understands that Servicemaster owns defendant Terminix d/b/a Schendel Pest Services. Plaintiff testified that Servicemaster provided the employee handbook and Human Resources services during her employment. Servicemaster also issued plaintiff's paycheck. But, Terminix employed plaintiff's boss's bosses, and Terminix hosted all of the regional meetings that plaintiff attended. Also, plaintiff held a position with Schendel Pest Services, and she had business cards with that company's name on them. Under these facts, the court concludes that both defendants were plaintiff's "employer" under Title VII.

Next, the court must determine the damages that plaintiff may recover for defendants' Title VII violations. Plaintiff seeks the following damages under Title VII: compensatory damages for emotional distress and lost wages; punitive damages; reasonable attorney's fees; and costs. Title VII entitles plaintiff to recover each of these types of damages. The court addresses each type, in turn, below.

### 1. Compensatory Damages for Emotional Distress

Title VII allows compensatory damages for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses. *See* 42 U.S.C. § 1981a(b)(3). Here, plaintiff seeks $50,000 in compensatory damages for emotional distress. Plaintiff bases her damage request on the stress and mental anguish she has experienced since defendants terminated her employment. Plaintiff testified about the stress she has experienced trying to find new employment and the embarrassment she feels when she honestly explains to potential employers that her last employer fired her. Plaintiff also testified about the stress she has experienced from not having enough income to pay her bills. And, plaintiff described how she has days when she cries and feels depressed. The court concludes that plaintiff adequately has shown that she has sustained emotional distress and that an award of $50,000 is sufficient to compensate her for those losses.

### 2. Compensatory Damages for Lost Wages

Title VII also allows equitable relief, which includes back pay and front pay. *See Medlock v. Ortho Biotech, Inc.*, 164 F.3d 545, 556 (10th Cir. 1999), *cert. denied*, 528 U.S. 813 (citing 42 U.S.C. §§ 1981a(b)(2) and 2000e-5(g)). The court has discretion to award back pay and front pay. *See Daneshvar v. Graphic Tech., Inc.*, 40 F. Supp. 2d 1225, 1239–41 (D. Kan. 1998). Back pay covers the time period from termination until the time of judgment, and front

pay compensates for future earnings loss after the time of judgment. *See id.*; *see also Pitre v. W. Elec. Co.*, 843 F.2d 1262, 1278 (10th Cir. 1988) (front pay intended to compensate for continuing future effects of discrimination until victim can be made whole).

Plaintiff testified that her annual total compensation (including benefits) was $60,000. After dividing that figure by 52 weeks in a year, plaintiff estimated that she earned about $1,153.85 in weekly wages from defendants. At the hearing, plaintiff calculated that her lost income from her termination date in mid-February 2017 to the date of the hearing was 34.5 weeks times her weekly wages of $1,153.85, for a total of $39,807.82 in lost wages.

Plaintiff also testified that since her termination, she has earned about $11,700 in wages from her independent contractor position with the Small Business Growth Alliance. Deducting the $11,700 in earned wages from the $39,807.82 in lost wages, plaintiff asks the court to award her a total of $28,107.82 in lost wages. The court finds plaintiff's calculation appropriate for her back pay damages. The court awards plaintiff back pay, but adjusts the amount accordingly to account for the additional time that has passed between the hearing date and the date of the judgment.

Plaintiff also seeks a three to five year award for front pay. Both the Tenth Circuit and our court have approved front pay awards ranging from two to five years. *See*, *e.g.*, *Jackson v. City of Albuquerque*, 890 F.2d 225, 235 (10th Cir. 1989) (affirming a two-year front pay award for a plaintiff in a wrongful termination case); *Mathiason v. Aquinas Home Health Care, Inc.*, 187 F. Supp. 3d 1269, 1278 (D. Kan. 2016) (finding that three years was an appropriate front pay award in a discrimination case); *Olivas v. Bentwood Place Apartments, LLC*, No. 09-4035-JAR, 2010 WL 2952393, at *8 (D. Kan. July 26, 2010) (awarding three years of front pay in a Title VII case alleging race, sex, and national origin discrimination); *Baty v. Willamette Indus., Inc.*,

985 F. Supp. 987, 1001 (D. Kan. 1997) (awarding five years of front pay in a retaliatory discharge case).

Here, the court finds that a three-year front pay award is sufficient to compensate plaintiff while she searches for other comparable employment. Deciding the appropriate length of a front pay award is a vexing task. The authority addressing this question squarely is limited and not easy to apply. But the circumstances here convince the court that a three-year period is sufficient but not greater than necessary. The court observed plaintiff's demeanor and ability. It finds that plaintiff is an intelligent, articulate, and resourceful person. While defendants' lawless conduct undoubtedly has harmed her, the court is equally certain that plaintiff will recover her footing in the employment market within three years.

The court thus takes plaintiff's estimated annual salary of $60,000 and subtracts plaintiff's yearly mitigation earnings of $31,200 ($2,600 times 12 months), for a total annualized lost salary of $28,800. Multiplying that figure by three years, the court awards plaintiff $86,400 in front pay damages.

### 3. Punitive Damages

Title VII authorizes an award of punitive damages "if the complaining party demonstrates that the respondent engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual." *See* 42 U.S.C. § 1981a(b)(1). But, section 1981a(b)(3) limits the sum of compensatory and punitive damages based on the number of employees the respondent employs. For example, § 1981a(b)(3)(D) limits damages to $300,000 against a respondent who has more than 500 employees in each of 20 or more calendar weeks in the current or preceding calendar year.

15

Here, plaintiff testified that each defendant employs more than 500 employees. So, § 1981a(b)(3)(D) caps plaintiff's compensatory damages to $300,000. Plaintiff asks the court to award her an amount less than the statutory cap: She seeks $200,000 in punitive damages. Plaintiff asserts that this award is necessary to punish defendants for their handling—or, more accurately, their failed handling of—her discrimination complaints. Plaintiff testified that she complained about sex discrimination as many as 20 to 30 times during her employment. Defendants did nothing to respond. Defendants simply directed plaintiff to contact other people or file new complaints using different avenues but they never corrected the discrimination. Plaintiff testified that her boss just laughed at her complaints and told her that she needed to roll with the punches.

Plaintiff also asserts that her requested punitive damages award is justified as punishment for the way defendants terminated plaintiff's employment. Plaintiff testified that her termination was pretext for discrimination. Defendants told plaintiff that her termination was based on inadequate sales, but other male employees did not meet their sales quotes and retained their employment. Also, plaintiff testified that defendants gave certain male employees the higher end referrals, allowing them to make those lucrative sales, meet their sales quotas, and earn large commissions.

Based on all these facts, the court concludes that an award of punitive damages is necessary to punish defendants and deter them from engaging in future sex discrimination and retaliation in the work place. But, the court concludes that $100,000 is a sufficient amount of punitive damages to accomplish this goal. This amount also is more consistent with the Title VII punitive damages that our court has awarded. *See*, *e.g.*, *Hudson v. AIH Receivable Mgmt. Servs.*, No. 10-CV-2287-JAR, 2012 WL 5306277, at *10 (D. Kan. Oct. 29, 2012) (approving jury's

award of $75,000 in punitive damages on a hostile work environment claim); *Rahn v. Junction City Foundry, Inc.*, 161 F. Supp. 2d 1219, 1245 (D. Kan. 2001) (approving jury's award of $30,000 in punitive damages in a sexual harassment and retaliation case); *Daneshvar*, 40 F. Supp. 2d at 1241–42 (concluding in a retaliatory discharge case that a $50,000 punitive damages award was "appropriate and necessary to deter future retaliatory conduct on the part of defendant").

### 4. Attorney's Fees and Costs

Finally, Title VII allows a prevailing party to recover "reasonable attorney's fee (including expert fees) as part of the costs." 42 U.S.C. § 2000e-5(k). At the default hearing, plaintiff's counsel asserted that they intended to seek their fees and costs by filing the appropriate fee request within 14 days of the court's order ruling plaintiff's Motions for Default Judgment. The court grants plaintiff's counsel's request and orders counsel to file a motion for attorney's fees and costs consistent with Fed. R. Civ. P. 54(d) and our local rule, D. Kan. Rule 54.2, within 14 days of the date of this Order.

**IT IS THEREFORE ORDERED BY THE COURT THAT** plaintiff's Motions for Default Judgment against defendants The Servicemaster Company and Terminix d/b/a Schendel Pest Services under Fed. R. Civ. P. 55(b)(2) (Docs. 12 & 13) are **GRANTED**.

**IT IS FURTHER ORDERED THAT** judgment be entered in favor of plaintiff against defendants in the amount of $29,261.68 for back pay damages,[1] $86,400 for front pay damages, $50,000 for emotional distress damages, and $100,000 for punitive damages.

---

[1] The court calculates this figure by multiplying plaintiff's weekly lost wages of $1,153.85 by 35.5 weeks, for a total of $40,961.68 in lost wages. The court subtracts from that amount the $11,700 that plaintiff has earned in her independent contractor position for a total of $29,261.68.

**IT IS FURTHER ORDERED THAT** plaintiff's counsel must file any motion for attorney's fees and costs consistent with Fed. R. Civ. P. 54(d) and our local rule, D. Kan. Rule 54.2, within 14 days of the date of this Order.

**IT IS SO ORDERED.**

**Dated this 25th day of October, 2017, at Topeka, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**